IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | )    No. 11-20098 Ma/P |
| | ) |
| DEWAYNE GHOSTON and GREGORY | ) |
| BRATCHER, | ) |
| | ) |
|     Defendants. | ) |

**REPORT AND RECOMMENDATION**

    Before the court by order of reference are defendants Dewayne Ghoston's and Gregory Bratcher's Motions to Suppress Evidence. (ECF Nos. 44 & 45.) The United States ("government") filed responses in opposition to the motions. Pursuant to the order of reference, the court held a suppression hearing on the motions. At the hearing, testimony was given on behalf of the government by Special Agent Dustin James of the West Tennessee Judicial Violent Crime Task Force ("Task Force"), Tennessee State Trooper Jeffrey Fuller, and Special Agent-in-Charge David Lytal. The court also heard testimony from Ghoston, Bratcher, and Ghoston's ex-girlfriend, Stacey Douglas.

    Based on the briefs filed in support of and in opposition to the motions and the evidence presented at the hearing, the court submits the following proposed findings of fact and conclusions of

law, and recommends that the Motions to Suppress be denied.

## I.  PROPOSED FINDINGS OF FACT

The court has carefully considered the testimony of all of the witnesses, including their demeanor as they testified at the hearing.  The court finds the government's witnesses credible, and also finds credible the testimony of Stacey Douglas regarding the circumstances in which she allowed Ghoston to borrow her rental vehicle.  To the extent the testimony of Ghoston and Bratcher conflicts with the testimony of the officers, the court finds the defendants' testimony not credible.[1]

On Monday, March 21, 2011, Dewayne Ghoston borrowed a silver Toyota Corolla from Stacey Douglas, who at the time was Ghoston's girlfriend.  Douglas had rented the Corolla earlier that weekend from a Hertz Rental Car in Memphis, Tennessee.  Although Ghoston was not listed on the rental agreement as an authorized driver, Douglas gave him permission to drive the car.  Douglas did not impose any restrictions on Ghoston regarding how long he could use the car or where he could drive it.  After borrowing the car from Douglas, Ghoston picked up his cousin, Gregory Bratcher, at around midnight to take him to see a friend in Kentucky.

At approximately 1:05 a.m. on March 22, 2011, Agent Dustin James and Trooper Jeffrey Fuller were in their parked police vehicles at mile marker 25 on Interstate 40, just outside the

---

[1]These discrepancies in the testimony are noted below.

Memphis city limits. Agent James was monitoring the speed of vehicles traveling eastbound on Interstate 40 when he observed the Corolla traveling at a high rate of speed. Using his radar gun, Agent James determined that the car was traveling 86 miles per hour in a 65 mile per hour zone.[2] Agent James activated his emergency lights and initiated a traffic stop of the Corolla. Ghoston, who was driving the car, pulled over to the right shoulder near mile marker 29. Agent James pulled directly behind him. Agent James noticed that there were two occupants in the car and that it had an Illinois licence plate.

Agent James approached the car and motioned with his hand for Ghoston to step outside and come toward the back of the car.[3] Ghoston exited the car and walked over to Agent James.[4] Agent

---

[2] At the suppression hearing, both defendants conceded that the Corolla was traveling in excess of the posted speed limit. Neither defendant argues that Agent James did not have a lawful basis to initiate the traffic stop.

[3] Agent James testified that he asked Ghoston to exit the vehicle for safety reasons, as the traffic stop occurred on an interstate and he did not want to stand on the driver's side next to oncoming traffic.

[4] The defendants testified that Ghoston remained in the Corolla while Agent James checked their driver's licenses, contrary to Agent James's testimony that Ghoston stepped out of the car and stood at the rear of the Corolla while Agent James checked their licenses. Ghoston also testified that he listened to music on his car radio during this time, and that based on the number of songs that were played, he estimated Agent James took about twelve to fifteen minutes to check their licenses. Bratcher testified that Agent James took five to ten minutes to check their licenses. This testimony conflicts with Agent James's testimony that it took him only "one or two minutes" to run their licenses, because he learned

James informed Ghoston that he had been speeding and asked for his driver's license. Ghoston complied and handed over his driver's license. Agent James asked Ghoston where they had come from and where they were going. Ghoston responded that they had come from Memphis and were headed to Kentucky.[5] After speaking with Ghoston, Agent James approached the front passenger's side and asked Bratcher for his identification. Bratcher produced a driver's license, at which time Agent James returned to his police vehicle to run the driver's licenses through his onboard computer.[6] Due to technical problems, Agent James was unable to log into the Criminal Justice Portal, the database that he used to run driver's licenses. After two unsuccessful attempts to log into his computer, Agent James called Trooper Fuller and requested assistance. Agent James then exited his vehicle and explained to Ghoston that he was having trouble accessing his computer and that he had requested assistance

---

after two failed attempts to log into his onboard computer that his computer was not working properly. The court finds Agent James's testimony credible on these disputed facts.

[5] At the hearing, Agent James could not recall exactly what Ghoston told him regarding where they were going. However, Agent James did recall that when he later asked Bratcher the same question, Bratcher stated that they were going to Jackson, Tennessee, and that this information contradicted the information given by Ghoston.

[6] It is unclear whether Bratcher gave Agent James a driver's license or some other state-issued identification card. The court will refer to the identification card provided by Bratcher as a driver's license, because the type of identification card provided by Bratcher has no bearing on the outcome of his motion.

from another officer.  Agent James estimated that only "one or two minutes" elapsed from the time he initially attempted to log into his computer to the time he called Trooper Fuller for assistance.

Trooper Fuller arrived on the scene within three to four minutes of receiving the request for assistance.  Agent James provided him with the two driver's licenses.  Trooper Fuller returned to his vehicle and proceeded to check the licenses using his onboard computer.  Trooper Fuller was able to access one database to check the validity of the licenses and another database to check for outstanding warrants and criminal history.  It took Trooper Fuller approximately ten to fifteen minutes to perform these checks.[7]  According to Trooper Fuller, he could check the driver's licenses just as fast (if not faster) using his computer as having a dispatcher check the licenses.

While Trooper Fuller was checking the licenses, Agent James approached Bratcher, who remained in the front passenger's seat, and asked him where they were headed.  Bratcher responded that they were going to Jackson, Tennessee.  Agent James recognized that this information was different from the information provided by Ghoston.  Agent James then asked whether there were any narcotics or firearms

---

[7]The defendants testified that Trooper Fuller took only three to five minutes to check the licenses.  The court credits the testimony of Agent James and Trooper Fuller over the testimony of the defendants on this fact.

in the vehicle.[8]  In response, Bratcher admitted that there was a marijuana cigarette in the center console, which he removed and handed to Agent James.  Agent James then approached Ghoston and without telling him about the discovery of the marijuana, asked him whether there were any narcotics or firearms in the car.[9]  Ghoston stated that there was an unloaded, "broken down" shotgun in the trunk.[10]

At that point, Agent James called for additional assistance. Within a few minutes, Agents David Lytal and Johnny Carter arrived on the scene.  At around this same time, Trooper Fuller completed his driver's license check.  He reported to Agent James that the

---

[8]According to Bratcher, Agent James prefaced this question by falsely telling him that Ghoston had given consent to search the vehicle.  Agent James, however, testified that he only asked whether any drugs or firearms were present.  The defendants also testified that the question about whether there were drugs or guns in the car was not asked until after Trooper Fuller completed his driver's license check and returned the licenses to the defendants. Agent James, on the other hand, testified that these questions were posed to the defendants while he was waiting for Trooper Fuller to complete his license checks.  The court credits the testimony of Agent James over the testimony of the defendants.

[9]Agent James testified that he believed he could search the vehicle after learning about the marijuana.  However, he did not inform the defendants of his intent to search the vehicle.

[10]Ghoston testified at the hearing that Agent James confronted him with the marijuana cigarette and said that he was going to search the car, and that based on what Agent James said, Ghoston admitted that there was a shotgun in the trunk.  Agent James testified that he did not mention his discovery of the marijuana to Ghoston and did not say anything else to Ghoston other than asking him if there were drugs or guns in the car.  The court finds Agent James credible and Ghoston not credible on these facts.

licenses were valid, but that both men might have prior felony convictions. The officers then placed Ghoston and Bratcher into separate squad cars and searched the Corolla. In the trunk, they found a black duffel bag that contained a sawed-off shotgun, shotgun shells, duct tape, a box of latex gloves, a black bandana, and a BB gun.

Agent James then contacted the Fayette County Sheriff's Office in order to perform a full criminal history check. The dispatcher confirmed that both men had prior felony convictions. They were placed under arrest and taken to the Task Force office for booking and processing. The officers had the Corolla towed from the scene. At the Task Force office, Ghoston and Bratcher were placed in separate interview rooms. Both defendants were advised of their Miranda rights, waived their rights, and agreed to answer the officers' questions. Ghoston claimed ownership of the shotgun and said that he kept it for protection. Ghoston and Bratcher were subsequently indicted for being convicted felons in possession of a firearm, in violation of 18 U.S.C. § 922(g).

In the present motions, the defendants seek to suppress all physical evidence seized from the search of the Corolla. They argue that, although Agent James had a lawful basis to stop the vehicle for speeding, the officers violated the defendants' Fourth Amendment rights by impermissibly expanding the scope and duration of the traffic stop. They also contend that because the officers

exceeded the proper scope of the traffic stop, any statements made to police during and after the stop should be suppressed pursuant to the "fruit of the poisonous tree" doctrine.[11]  See Wong Sun v. United States, 371 U.S. 471 (1963).

## II. PROPOSED CONCLUSIONS OF LAW

"When law enforcement officers witness a traffic violation, they may stop the driver and his car, because there is nothing unreasonable about stopping a vehicle whose driver has just committed a traffic violation."  United States v. McColley, No. 3:09-00193, 2011 WL 253166, at *4 (M.D. Tenn. Jan. 25, 2011) (quoting United States v. Street, 614 F.3d 228, 232 (6th Cir. 2010) (internal quotation marks omitted)).  "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  Whren v. United States, 517 U.S. 806, 810 (1996).  Here, both defendants concede that Agent James lawfully stopped the Corolla, because he had probable cause that the vehicle was traveling in excess of the posted speed limit.

Even if an initial stop is valid, an officer may impermissibly exceed the scope of the stop because "a seizure that is lawful at

---

[11]While both Ghoston and Bratcher seek to suppress statements that they made to officers at the Task Force office after their arrest, the sole basis for seeking suppression of these statements is that they were obtained as a result of the unlawful vehicle stop. Therefore, the court does not address the circumstances under which these statements were obtained at the Task Force office.

its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." McColley, 2011 WL 253166, at *5 (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005) (internal quotation marks omitted)). The Fourth Amendment protects interests that include the "freedom of movement and insulation from the fear and anxiety produced by unlawful seizure. In the traffic stop scenario, these interests are personal to all occupants of the vehicle that is detained." United States v. Richardson, 385 F.3d 625, 629 (6th Cir. 2004). Thus, occupants traveling in a stopped vehicle have "standing" to challenge the legitimacy of the stop as a seizure of his or her person, even if they may lack standing to challenge the search of a vehicle over which they have no possessory or ownership interest.[12] See Brendlin v. California, 551 U.S. 249, 258-59 (2007); United States v. Decker, 19 F.3d 287, 288 (6th Cir. 1994); United States v. Carter, 14 F.3d 1150, 1154 (6th Cir. 1994); see also United States v. Villaverde-Leyva, No. 1:10-035, 2010 WL 5579825, at *15 (N.D. Ga. Dec. 9, 2010) (collecting cases

---

[12] The Sixth Circuit has recognized that "[s]tanding to challenge a search or seizure is a matter of substantive Fourth Amendment law rather than of Article III jurisdiction." United States v. Dyer, 580 F.3d 386, 390 (6th Cir. 2009) (citation and internal quotation marks omitted); see also United States v. Smith, 263 F.3d 571, 581-82 (6th Cir. 2001) (explaining that although the inquiry into whether a defendant has the right to challenge a search under the Fourth Amendment is often referred to as a question of "standing," the issue is actually one of substantive Fourth Amendment law, and whether a defendant can prove a legitimate expectation of privacy as a prerequisite to challenging police conduct).

indicating that majority of courts have concluded <u>Brendlin</u> does not modify <u>Rakas v. Illinois</u>, 439 U.S. 128 (1978), as it relates to a passenger's standing to contest the search of another's vehicle). "Although a passenger does not have a legitimate expectation of privacy in the searched vehicle, 'as a passenger [a defendant] may still challenge the stop and detention and argue that the evidence should be suppressed as fruits of illegal activity.'" <u>United States v. Ellis</u>, 497 F.3d 606, 612 (6th Cir. 2007) (quoting <u>United States v. Jones</u>, 374 F. Supp. 2d 143, 154 (D.D.C. 2005)).

Under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), a stop must be reasonable in terms of scope and duration to the circumstances justifying the stop. As stated by the Sixth Circuit:

> [t]o qualify as reasonable seizures under the Fourth Amendment, <u>Terry</u> detentions must be limited in both scope and duration. Under <u>Terry</u>'s duration prong, a stop must last no longer than is necessary to effectuate the purpose of the stop. Under its scope prong, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

<u>United States v. Everett</u>, 601 F.3d 484, 488-89 (6th Cir. 2010) (internal citations and quotation marks omitted). "To detain a motorist any longer than is reasonably necessary to issue the traffic citation, however, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct." <u>United States v. Aquilera-Pena</u>, 426 F. App'x 368, 370 (6th Cir. 2011) (quoting <u>United States v. Townsend</u>, 305 F.3d 537, 541 (6th Cir. 2002) (internal quotation marks omitted)).

In the present case, the court finds that the scope and duration of the traffic stop were reasonably limited to the purpose of the stop. It was reasonable for Agent James to ask Ghoston to exit the vehicle and stand at the rear of the car. See Arizona v. Johnson, 555 U.S. 323, 331 (2009) ("In [Pennsylvania v. Mimms, 434 U.S. 106 (1977)], the Court held that 'once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'").

Agent James did not exceed the scope of the detention by obtaining the defendants' licenses in order to check whether the defendants had valid identification and whether they had any outstanding warrants. See Smith, 601 F.3d at 542 ("Nor was it inappropriate for [the officer] to check both whether Williams and Garrett had valid identification and whether they had any outstanding warrants."); United States v. Bell, 555 F.3d 535, 541 (6th Cir. 2009) ("In a traffic stop, an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity would be well within the bounds of the initial stop.") (quoting United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999) (internal quotation marks omitted)); see also United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc) ("[A] motorist

may be detained for a short period while the officer runs a background check to see if there are any outstanding warrants or criminal history pertaining to the motorist even though the purpose of the stop had nothing to do with such prior criminal history."), abrogated on other grounds as stated in United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007).

Next, Agent James was justified in asking Ghoston and Bratcher about their travel plans. See Ellis, 497 F.3d at 613-14 ("In obtaining the driver's driving license and vehicle registration, Trooper Topp was justified in asking the occupants general questions of who, what, where, and why regarding their 3:23 a.m. travel."); United States v. Potts, No. 97-6000, 1999 WL 96756, at *4 (6th Cir. 1999) ("It is well established that an officer is free to ask traffic-related questions, and questions about a driver's identity, business and his travel plans during the course of a traffic stop.").

Agent James was justified in requesting assistance from Trooper Fuller after he discovered that his computer was not working. Agent James knew that Trooper Fuller was nearby – they were both parked at mile marker 25 a few minutes prior to the traffic stop – and he knew that Trooper Fuller had access to a computer. It took Trooper Fuller only a few minutes to arrive on the scene, and once he arrived he promptly began checking the defendants' driver's licenses. Although Agent James perhaps could

have called a dispatcher for similar information, his decision to ask Trooper Fuller for assistance was not unreasonable. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." United States v. Sharpe, 470 U.S. 675, 687 (1985). There is no evidence to suggest that Agent James called Trooper Fuller for the purpose of prolonging the traffic stop or that the manner in which Trooper Fuller conducted his license checks was unreasonable.

In addition, Agent James's questions about whether there were drugs or weapons in the car did not exceed the scope, or unreasonably prolong the duration, of the stop. Although Agent James stopped the Corolla only for speeding, "the Supreme Court has emphasized that 'the safety of the officer' during a traffic stop is a 'legitimate and weighty' interest" and "there has been widespread agreement . . . that officers conducting a traffic stop may inquire about dangerous weapons." Everett, 601 F.3d at 495 (quoting Mimms, 434 U.S. at 110). In addition, these questions were asked while Agent James was still waiting for Trooper Fuller to complete his computer checks, and thus the questions did not prolong the stop. Id. at 495 (concluding that officer who stopped vehicle for speeding could ask driver about presence of drugs because "the additional delay caused by the insertion of several extra words [that were less directly related to officer safety],

under the totality of the circumstances, does not signify a lack of diligence"). In Arizona v. Johnson, the Supreme Court held that "an officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquires do not measurably extend the duration of the stop." Johnson, 555 U.S. at 333. In Everett, the Sixth Circuit analyzed Johnson and Muehler v. Mena, 544 U.S. 93 (2005), and explained that under those Supreme Court decisions, "an officer may ask unrelated questions to his heart's content, provided he does so during the supposedly dead time while he or another officer is completing a task related to the traffic violation."[13] Id. at 492. Because Agent James posed these questions to the defendants during "dead time," his actions did not violate the defendants' rights under Terry v. Ohio.

Moreover, because the questions were asked during the course of a traffic stop and not while the defendants were in custody, Agent James was not required to advise the defendants of their Miranda rights prior to questioning. See United States v. Bevelle, 437 F. App'x 399, 407 (6th Cir. 2011) (warnings described in Miranda v. Arizona, 384 U.S. 436 (1966), are required only during

---

[13]The Everett court also found that some prolongation of a traffic stop due to unrelated questioning during the course of the stop is permissible, so long as the officer does not "without reasonable suspicion, definitively abandon[] the prosecution of the traffic stop and embark[] on another sustained course of investigation." Id. at 495.

custodial interrogation). The Supreme Court has stated that "the temporary and relatively nonthreatening detention involved in a traffic stop or Terry stop . . . does not constitute Miranda custody." Maryland v. Shatzer, 130 S. Ct. 1213, 1224 (2010) (citing Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984)). The fact that a motorist is not free to leave once he is pulled over as part of a traffic stop is not sufficient to establish custody. Berkemer, 468 U.S. at 436-37.

Once Agent James learned that there was marijuana in the car, he could search the vehicle, including the trunk, under the automobile exception to the warrant requirement. "Under the automobile exception to the warrant requirement, law enforcement officers may search a readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime." United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998) (citing United States v. Ross, 456 U.S. 798, 799 (1982)). This search may include all parts of a legitimately stopped vehicle, including the trunk and all containers. United States v. Burns, 298 F.3d 523, 542 (6th Cir. 2002) (citing Ross, 456 U.S. at 825). The court finds that the marijuana cigarette provided Agent James with probable cause to believe that the vehicle contained drugs, and thus he was justified in searching all areas of the vehicle, including the trunk, where drugs could have been stored. See United States v. Bailey, 407 F. App'x 27, 29 (6th

Cir. 2011) (holding that strong smell of marijuana and marijuana found on the floorboard of the car on the driver's side provided "more than enough probable cause" to justify a search of the entire vehicle, including the trunk); United States v. Burns, 298 F.3d 523, 542 (6th Cir. 2002) ("Once the bag of crack cocaine was found in plain view, the officers had probable cause to believe that other contraband might be in the car."); United States v. Burnett, 791 F.2d 64, 67 (6th Cir. 1986) (holding that where a small bag of marijuana was found on the floorboard of the car, the officer "had every right to search the passenger area of the car, the trunk, and any and all containers which might conceal contraband"); see also United States v. Johnson, 383 F.3d 538, 545-56 (7th Cir. 2004) (holding that discovery of cocaine on defendant's person after being arrested on an outstanding warrant gave officers probable cause to search trunk of defendant's vehicle); United States v. Turner, 119 F.3d 18, 20-21 (D.C. Cir. 1997) (holding that officer's observation through car window of personal use of marijuana gave the officer probable cause to search car trunk for additional drugs); United States v. Parker, 72 F.3d 1444, 1450 (10th Cir. 1995) (holding that smell of marijuana and marijuana cigarette on defendant's person gave officer probable cause to search entire car, including the trunk); United States v. Loucks, 806 F.2d 208, 210-11 (10th Cir. 1986) (smell of still-burning marijuana cigarette butts and a small bag of marijuana supported trunk search); United

States v. Orozco, 715 F.2d 158, 160 (5th Cir. 1983) (holding that officer's discovery of baggie of marijuana and drug paraphernalia in open glove compartment gave officer probable cause to search trunk); United States v. Allen, No. 4:08-cr-40, 2009 WL 3297286, at *4 (E.D. Tenn. Oct. 13, 2009) (stating that "the discovery of drugs in a car gives probable cause to search the entire car"). Finally, upon finding the shotgun in the trunk and subsequently confirming with the dispatcher that both defendants in fact had prior felony convictions, the officers had probable cause to arrest the defendants for being felons in possession of a firearm and to seize the shotgun as evidence of that crime.[14] United States v. McKnight, 385 F. App'x 547, 549 (6th Cir. 2010) ("officers may arrest-seize an individual in public when they have probable cause to believe the individual committed a crime").

### III. RECOMMENDATION

For the reasons above, the court recommends that both Motions to Suppress Evidence be denied.

Respectfully submitted,

    s/ Tu M. Pham
    TU M. PHAM
    United States Magistrate Judge

---

[14]Bratcher concedes that, as a passenger who did not have a possessory or ownership interest in the rental car, he does not have standing to challenge the search of the vehicle's trunk. Based on the court's conclusion that the officers had probable cause to search the trunk, the court does not reach the issue of whether Ghoston has standing to challenge the search.

<u>February 27, 2012</u>
Date

**NOTICE**
**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**